**Oddis Lloyd WILLIAMSON, Plaintiff,**

v.

**INTERNATIONAL PAPER COMPANY, Defendant.**

**No. Civ.A. 1:98–0540–RV–M.**

United States District Court,
S.D. Alabama,
Southern Division.

Jan. 27, 2000.

Nunc Pro Tunc Oct. 1, 1999.

Edward L.D. Smith, John P. Thompson, Smith & Smith, Mobile, AL, Richard W. Fuquay, Pittman, Pittman, Carwie & Fuquay, Mobile, AL, for Plaintiff.

Rebecca D. Parks, Cabaniss, Johnston, Gardner, Dumas & O'Neal, Birmingham, AL, Christine Reiger, Allison W. Keller, Thomas R. Brice, Milton, McGuire, Woods, Battle & Booth LLP, Jacksonville, FL,

Patrick H. Sims, Cabaniss, Johnston, Gardner, Dumas & O'Neal, Mobile, AL, for Defendant.

## ORDER

VOLLMER, District Judge.

This matter is before the court on the following documents:

1. "Motion for Partial Summary Judgment," (doc. 32), filed by defendant International Paper Company, together with a supporting memorandum, (doc. 33), and evidentiary material (docs. 34, 35, & 36);

2. Response, (doc. 42), filed by plaintiff Oddis Lloyd Williamson, together with evidentiary material (docs. 41 & 43) [1];

3. Reply, (doc. 45), filed by defendant;

4. Supplemental brief, (doc. 51), filed by plaintiff;

5. Response to supplemental brief, (doc. 52), filed by defendant, together with evidentiary material (doc. 53);

6. The parties' "Joint Pretrial Document." (doc. 48).

After due consideration, the court finds that, as to two of the three issues raised by plaintiff, no genuine issue of material fact exists and that defendant is entitled to summary judgment as a matter of law pursuant to Federal Rule of Civil Procedure 56. As to one issue, however, the court finds that genuine issues of material fact exist and that defendant is not entitled to judgment as a matter of law. Accordingly, it is

**ORDERED that the motion for summary judgment is GRANTED IN PART and DENIED IN PART. The court finds that the following facts are undisputed and makes the following conclusions of law.**

1. Plaintiff's "Motion to Accept Exhibits as Timely Filed," (doc. 43), is GRANTED for the reasons set forth therein.

## UNDISPUTED FACTS[2]

1. Plaintiff Oddis Lloyd Williamson began working at defendant International Paper Company (IP) in 1959. (Pretrial Doc., p. 5).

2. Plaintiff stopped working at IP on April 22, 1998, for reasons unrelated to this lawsuit. (*Id.*).

3. Plaintiff worked as a general mechanic during all times relevant to this case. (*Id.*).

4. In 1989, plaintiff was assigned to the maintenance department working in the machine shop. (*Id.*).

5. From 1989 until the end of 1996, there were 7–9 other general mechanics who were assigned to work in the machine shop. (*Id.*).

6. The machine shop had a break room where employees made coffee and prepared and ate meals during their breaks. (*Id.*).

7. In November 1996, plaintiff was moved across the street from the machine shop to the fabrication shop where he performed the same duties he performed in the machine shop. (*Id.*). At the same time, another machine shop employee, Larry Godfrey, was moved from the machine shop to another part of the Mobile mill. (*Id.*).

8. In 1992, plaintiff was diagnosed as a diabetic. (*Id.*).

9. Plaintiff controlled his diabetes with oral medication until August 1996 at which time he controlled the diabetes through insulin injections. (*Id.*).

10. In August 1996, plaintiff tested his blood sugar in the machine shop break room using the finger prick technique. (*Id.*).

11. Some of the other machine shop employees objected to plaintiff pricking his finger in certain areas of the mill. Defen-

2. Most of these undisputed facts are taken from the "Admitted or Uncontested Facts" section in the parties' Joint Pretrial Document. (doc. 48).

dant subsequently required plaintiff to perform the blood sugar test in the mill's medical department. (*Id.*).

12. Plaintiff complained about performing the blood tests in the medical department but complied. (*Id.*).

13. Plaintiff filed a charge of discrimination on July 7, 1997, with the Equal Employment Opportunity Commission alleging disability discrimination due to his diabetes.

## CONCLUSIONS OF LAW

### I. Jurisdiction and Venue

The court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331. Venue is proper pursuant to 28 U.S.C. § 1391(b).

### II. Legal Standard

As the Court of Appeals for the Eleventh Circuit has cogently explained:

> Summary judgment is proper in cases in which there is no genuine issue of material fact. Fed.R.Civ.P. 56(c).... [The court] must view all of the evidence in the light most favorable to the non-moving party. *Samples ex. rel. Samples v. City of Atlanta,* 846 F.2d 1328, 1330 (11th Cir.1988). The movant bears the initial burden of presenting evidence sufficient to demonstrate the absence of a genuine issue of material fact. *Celotex Co. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). When the movant has met its burden, the non-movant must then designate, by affidavits, depositions, admissions, and answers to interrogatories, specific facts showing the existence of a genuine issue for trial. *Jeffery v. Sarasota White Sox, Inc.,* 64 F.3d 590, 593–94 (11th Cir.1995).

*Southern Solvents, Inc. v. New Hampshire Ins. Co.,* 91 F.3d 102, 104 (11th Cir.1996).

### III. Disability Harassment—Actual and Perceived Disability Claim

■ Plaintiff Oddis Lloyd Williamson claims that he was actually disabled under the Americans with Disabilities Act. More specifically, plaintiff claims that he was disabled based on his diabetes and that he was subjected to a hostile work environment because of the actual disability. Alternatively, plaintiff alleges that his employer perceived him to be disabled and that he was subjected to disability harassment based on this perception. The essence of plaintiff's claim is that he was harassed by his co-workers and discriminated against by his employer based on his diabetes—namely, due to the co-workers' exposure (real or perceived) to plaintiff's blood as a result of his "finger-pricking" on the job in order to test his blood-sugar level. Plaintiff alleges that he was verbally harassed ("hounded") by some of his co-workers, that he was denied the use of the break room facility (including the refrigerator therein), that he was forbidden to make the crew's coffee, that he was denied the use of a microwave in his supervisor's office, that he was falsely accused of leaving "bloody rags" lying around and exposing the co-workers to his blood in other ways, that he was moved/segregated away from his crew, that he was required to go to the mill's medical department to check his blood-sugar level even though other diabetic employees were not so required, etc. It is important to note that plaintiff is not claiming that his employer failed to accommodate him in some way; rather, plaintiff claims that he was subjected to harassment because of his disability. This claim is a hybrid of ADA and Title VII.[3]

---

3. Although disability harassment has not been formally recognized by any federal court of appeals, several of them have assumed that such an ADA hostile work environment claim is actionable in order to rule on the cases before them and have analyzed the claims under the same scheme used in Title VII hostile work environment claims. *See Walton v. Mental Health Ass'n,* 168 F.3d 661, 666–67 (3rd Cir.1999); *McConathy v. Dr. Pepper/Seven Up Corp.,* 131 F.3d 558, 563 (5th Cir.1998); *Silk v. City of Chicago,* 194 F.3d 788, 803–04 (7th Cir.1999); *Wallin v. Minnesota Dep't of Corrections,* 153 F.3d 681, 687–88 (8th Cir. 1998), *cert. denied,* 526 U.S. 1004, 119 S.Ct. 1141, 143 L.Ed.2d 209 (1999); *Anthony v. City of Clinton,* 185 F.3d 873, 1999 WL 390927 *3 (10th Cir.1999) (unpublished decision). *See also Keever v. City of Middletown,*

## A. Disability Under the ADA

■ The first issue presented is whether plaintiff was actually disabled. Title I of the Americans with Disabilities Act of 1990 prohibits a covered employer[4] from discriminating against a qualified individual with a disability because of that person's disability. *See Cleveland v. Policy Management Systems Corp.*, 526 U.S. 795, ——, 119 S.Ct. 1597, 1601, 143 L.Ed.2d 966 (1999). A "qualified individual with a disability" is any person "with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). A plaintiff alleging discrimination in violation of the ADA bears the burden of establishing a *prima facie* case, including that he is disabled. *See* footnote 3; *Moses v. American Nonwovens, Inc.*, 97 F.3d 446, 447 (11th Cir.1996). For the reasons given below, the court concludes that plaintiff has failed to demonstrate that he has a disability under the ADA.

■ The determination of whether a person has a disability within the meaning of the ADA must be conducted on a case-by-case basis. *See Sutton v. United Air Lines, Inc.*, 527 U.S. 471, ——, 119 S.Ct. 2139, 2147, 144 L.Ed.2d 450 (1999) ("whether a person has a disability under the ADA is an individualized inquiry"); *see also* 29 C.F.R. Pt. 1630, App. § 1630.2(j) (1998) ("The determination of whether an individual has a disability is not necessarily based on the name or diagnosis of the impairment the person has, but rather on the effect of that impairment on the life of the individual."). The ADA defines a "disability" as "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(2). Thus, to be "disabled" within the meaning of the ADA, plaintiff must have an actual disability or be regarded as having a disability.[5] The court will address each definition in turn.

## B. Whether Plaintiff has an Actual Disability

■ The mere presence of an impairment is not, by itself, sufficient to constitute a disability under the ADA. *See Standard v. A.B.E.L. Services, Inc.*, 161 F.3d 1318, 1327 (11th Cir.1998). Rather, a disability exists only where the impairment substantially limits one or more major life activities. *See Albertsons, Inc. v. Kirkingburg*, 527 U.S. 555, ——, 119 S.Ct. 2162, 2162, 144 L.Ed.2d 518 (1999). The Supreme Court has articulated a three-step inquiry for determining whether an impairment substantially limits a major life activity so as to constitute a disability under the ADA. *See Bragdon v. Abbott*, 524 U.S. 624, 631, 118 S.Ct. 2196, 2202, 141 L.Ed.2d 540 (1998). First, the court must ascertain whether plaintiff suffers from a physical or mental "impairment." Next, the court must identify whether the life activity purportedly impacted by that impairment is a "major life activity." Final-

145 F.3d 809, 813 (6th Cir.) (implicitly recognizing ADA hostile work environment claim in affirming summary judgment for employer), *cert. denied*, 525 U.S. 809, 119 S.Ct. 407, 142 L.Ed.2d 330 (1998).

After due consideration, the court concludes that plaintiff has stated a cognizable cause of action for disability harassment. Accordingly, plaintiff must establish that: (1) he is disabled or perceived to be disabled; (2) he was subjected to unwelcome harassment; (3) the harassment to which he was subjected was based on his actual or perceived disability; (4) the harassment affected a term, condition, or privilege of his employment; and (5)

defendant employer knew or should have known of the harassment but failed to take prompt, remedial action. *McConathy*, 131 F.3d at 563.

4. Specifically, the ADA applies to any employer "engaged in an industry affecting commerce who has 15 or more employees for each working day in each of 20 or more calendar weeks in the current or preceding calendar year." 42 U.S.C. § 12111(5)(A). There is no dispute that defendant meets this definition.

5. Plaintiff does not claim that he had a record of disability.

ly, the court must determine whether the claimed impairment "substantially limits" that major life activity. *See id.*

### 1. Impairment

In addressing the first step of this inquiry, the court notes that the ADA does not define the term "impairment." However, the Equal Employment Opportunity Commission ("EEOC") has promulgated regulations upon which the court may rely for guidance in interpreting the ADA. *See Gordon v. E.L. Hamm & Associates, Inc.,* 100 F.3d 907, 911 (11th Cir.1996) (courts may seek direction from EEOC regulations implementing Title I of the ADA).

6. Plaintiff does not claim that he suffered from a mental impairment.

7. These definitions are not comprehensive. Rather, the impairments enumerated within the EEOC regulations are "a representative list of disorders and conditions constituting physical impairments, including such diseases and conditions as orthopedic, visual, speech, and hearing impairments, cerebral palsy, epilepsy, muscular dystrophy, multiple sclerosis, cancer, heart disease, diabetes, mental retardation, emotional illness, and ... drug addiction and alcoholism." *Bragdon,* 118 S.Ct. at 2202 (internal quotations omitted).

8. Plaintiff also alleges that, as a result of his diabetes, he suffers from:
* difficulty sleeping due to frequent urges to urinate
* impotence (to some unspecified degree)
* a restricted diet (plaintiff testified that Dr. Ashurst prescribed a 2000 calorie/day diet with no sweets)
* a need to avoid stress
* a need to avoid heat and moisture (this is discussed in the text)
* a need to avoid being alone (in the possible event of a diabetic coma which would render him unconscious, plaintiff asserts that he cannot be away from people too long, that he cannot operate power tools, that he cannot climb or be at unprotected heights, and that he cannot swim alone)
* a possibly of sustaining liver damage due to his taking of Rezuline
* dizziness
Frankly, it is not clear whether plaintiff is alleging that the foregoing effects/symptoms/conditions/needs constitute "impairments" or major life activities. Resolution of this uncertainty is not necessary, however, because there is no evidence that his co-workers or his employer (the defendant) had

Those regulations define a "physical impairment" as a "physiological disorder, or condition, cosmetic disfigurement, or anatomical loss affecting one or more of the following body systems: neurological, musculoskeletal, special sense organs, respiratory (including speech organs), cardiovascular, reproductive, digestive, genitourinary, hemic and lymphatic, skin, and endocrine." 29 C.F.R. § 1630.2(h)(1) (1998).[6,7] In this case, the parties agree that the alleged impairment is plaintiff's insulin-controlled diabetes and that the "sub-impairment" is diabetic neuropathy.

Plaintiff alleges that, as a result of his diabetes, he suffers from neuropathy.[8]

knowledge of these matters, much less that they harassed plaintiff about them or otherwise discriminated against him because of them. In any event, the court easily concludes that plaintiff has not established that they (individually and collectively) substantially limit a major life activity. To the extent that any of them are a major life activity (such as eating and sleeping), plaintiff has not established that he was substantially limited in those major life activities. *See, e.g., Ingles v. Neiman Marcus Group,* 974 F.Supp. 996, 1002 (S.D.Tex.1997) (rejecting a diabetic plaintiff's claim that he was substantially limited in the major life activity of eating simply because he was supposed to eat well—"It is difficult to imagine that having to maintain a normal, healthy diet constitutes a disability.").

For example, plaintiff's evidence regarding his interrupted sleep (due to a frequent need to urinate) is wholly unsupported by any specific evidence which defines the scope and extent of the impairment—that is, there is no evidence as to the how many times a night plaintiff is awakened by the urge to urinate, how long he stays awake each time/how quickly he falls back to sleep, whether there are any mitigating measures available, the effect of the irregular sleep on his daily responsibilities and activities (there is no evidence that plaintiff's irregular sleep pattern interfered with his ability to work full-time and to otherwise carry on his daily routine), etc.

A second example is a lack of evidence regarding the frequency of plaintiff's impotence, leaving the court to speculate whether the condition is permanent or temporary. Additionally, although plaintiff states that the impotence is a result of his diabetes, there is no evidence that plaintiff's medication for his other physical impairments (such as hyper-

Specifically, the court must determine whether plaintiff's impairments of diabetes and neuropathy substantially limit a "major life activity."

## 2. Major Life Activity

The ADA does not define the phrase "major life activity," but EEOC regulations explain that major life activities are basic activities that the average person in the general population can perform with little or no difficulty. *See* 29 C.F.R. pt. 1630, App. § 1630.2(i) (1998). Major life activities include—but are not limited to— activities such as "caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R. § 1630.2(i) (1998); *see also* 29 C.F.R. pt. 1630, App. § 1630.2(i) (1998) (list of enumerated major life activities is not exhaustive).

Plaintiff alleges that, as a result of his diabetes, he suffers neuropathy; he has not, however, clearly articulated which major life activities were purportedly impacted by the diabetes as a whole or by the neuropathy caused by his diabetes. Plaintiff seems to argue that these impairments impact his ability to work or walk. The court agrees that these activities are major life activities under the ADA, as the EEOC regulations explicitly identify these activities as major life activities. *See* 29 C.F.R. § 1630.2(i) (1998).

## 3. Substantial Limitation

The final step in the actual disability analysis is to determine whether plaintiff's physical impairments "substantially limit" either of these major life activities. Be-

cause the ADA does not define this term, the court again turns to the EEOC regulations for guidance. According to those regulations, a physical impairment is "substantially limiting" if the individual is either "[u]nable to perform a major life activity that the average person in the general population can perform" or is "[s]ignificantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity." 29 C.F.R. § 1630.2(j)(1) (1998). In further discussing the "substantially limits" definition, the Supreme Court has noted that the term "substantially" suggests a limitation that is "considerable" or "specified to a large degree." *See Sutton,* 119 S.Ct. at 2150 (citing Webster's Third New International Dictionary 2280 (1976); 17 Oxford English Dictionary 66–67 (2d ed.1989)).

Defendant argues that plaintiff's physical impairments do not rise to the level of a disability under the ADA because they do not substantially limit any of his major life activities. In determining whether an impairment is substantially limiting, courts look to: (1) the nature and severity of the impairment; (2) the duration or expected duration of the impairment; and (3) the permanent or expected long-term impact of the impairment. *See Gordon,* 100 F.3d at 911 (citing 29 C.F.R. § 1630.2(j)(2) (1998)). With these principles in mind, the court turns to address whether the effects

tension medication)—for which he does not claim a disability—did not contribute to or cause the impotence.

As a third example, plaintiff's claim of dizziness appears to be wholly unrelated to this litigation, as his first reported dizzy spell occurred well after he commenced this action. See Ashurst depo. at pp. 41–42). Moreover, the physician who treats plaintiff for his diabetes testified that although plaintiff's "dizzy spell" "could be" a product of his diabetes, "there are lots of other things that can cause weak and dizzy." [sic]. *Id.* at p. 42).

The Court of Appeals for the Eleventh Circuit has repeatedly recognized that "[c]onclusory allegations without specific supporting facts have no probative value." *Hilburn,* 181 F.3d at 1228 (quoting *Evers v. General Motors Corp.,* 770 F.2d 984, 986 (11th Cir.1985)). Thus, plaintiff's barebone and conclusory statements are insufficient to establish a finding that these impairments substantially limit a major life activity, as are his speculations as to the possibility of a diabetic coma and liver damage from his medication.

of plaintiff's diabetes and neuropathy substantially limit his ability to work or walk.

In ruling on a motion for summary judgment, a district court is not obligated to speculate as to which part of the record the non-moving party relies, nor is it required to wade through the record and search for facts that might support the non-moving party's claim. *See Barge v. Anheuser–Busch, Inc.,* 87 F.3d 256, 260 (8th Cir.1996). Nonetheless, the court has undertaken an independent review of the evidence to ascertain whether it shows that plaintiff is disabled within the meaning of the ADA. For the reasons given below, the court concludes that this evidence does not establish that plaintiff is substantially limited in the major life activities of working or walking.

### a. Walking

When determining whether a person is substantially limited in the major activity of walking, the following factors should be considered:

(i) The nature and severity of the impairment;

(ii) The duration or expected duration of the impairment; and

(iii) The permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment.

29 C.F.R. Pt. 1630.2(j)(2).

Plaintiff's evidence of the extent of the alleged limitation on his ability to walk is minimal. The only proffered evidence constitutes of plaintiff's testimony and the testimony of one of his treating physicians, Dr. H. Morgan Ashurst. A reading of Dr. Ashurst's deposition discloses that plaintiff suffers not only from diabetes but from a number of other health problems, including hypertension, heart disease, high cho-

lesterol, back injury, and depression. (*See also* Williamson depo. at p. 35). Plaintiff is being treated by different doctors for the different aliments/conditions, with at least some overlap for the neuropathy treatment between Dr. Ashurst and a Dr. Gerald Silverboard. Plaintiff has not offered any evidence from Dr. Silverboard as to plaintiff's walking and working limitations. A third doctor, a Dr. Milton Wallace, treated plaintiff for his back injury. (Ashurst depo. p. 33). Except as mentioned below, plaintiff did not present any evidence from Dr. Wallace as to plaintiff's walking and working limitations.

As to plaintiff's neuropathy, Dr. Ashurst testified that he examined plaintiff on three occasions for this condition arising from plaintiff's diabetes. The first examination occurred on March 29, 1996 when plaintiff presented with "stinging, right thigh, feet stinging." (Ashurst depo. p. 32). In response, Dr. Ashurst "prescribed a soft mat and jogging shoes for his work." (Id.). This solution apparently worked, for the next time plaintiff presented himself with neuropathic symptoms was sometime in 1997, at which time Dr. Ashurst referred plaintiff to Dr. Silverboard. As mentioned above, plaintiff presented no evidence from Dr. Silverboard, and, thus, there is no evidence as to the treatment, if any, ordered by him in 1997 or whether plaintiff needed any follow-up treatment. The third time plaintiff presented to Dr. Ashurst with neuropathic symptoms was on May 11, 1998.[9] According to Dr. Ashurst's notes, plaintiff complained of "numbness in the his toes" and "feet numbness, burning and tingling." (*Id.* at p. 34). Plaintiff reported that these symptoms had been occurring for three weeks. There is no testimony as to Dr. Ashurst's prescribed treatment for plaintiff's third re-

9. Plaintiff filed this litigation on May 26, 1998, following the filing of his EEOC charge a year earlier in May 1997. Because this third incident of neuropathy occurred after the date of the alleged disability harassment, it should not be considered in determining whether plaintiff was disabled for such an inquiry is temporally limited to the dates of

the alleged harassment. *See Pritchard v. Southern Co. Services,* 92 F.3d 1130, 1133–34 (11th Cir.), *amended on reh'g,* 102 F.3d 1118 (11th Cir.1996). However, because its inclusion does not alter the court's conclusion, the court will consider it, as it indicates that plaintiff's neuropathy continues to occur (approximately once a year).

port of neuropathy. At this point in time, however, plaintiff was off work under a release issued by Dr. Wallace for problems related to his back injury, (*id.* at p. 38), and Dr. Ashurst's "only contribution" to Dr. Wallace's restriction on plaintiff's work was "that because of [plaintiff's] diabetes ... we recommended that he avoid extreme heat and moisture." (*Id.* at p. 35). Although Dr. Ashurst testified that he examined plaintiff at least once a year after plaintiff was diagnosed as diabetic, he never prescribed nor observed plaintiff use any type of corrective or mitigating devices such as leg braces, a cane, a walker, a wheelchair, etc. (*Id.* at p. 30). There is no evidence that plaintiff sought or obtained a handicapped parking license. Further, Dr. Ashurst testified that neuropathy "will go away" if the patient's "sugar gets under control." (*Id.* at pp. 30–31).[10] Dr. Ashurst stated that he did not know whether plaintiff continues to suffer from neuropathy because "Dr. Silverboard is pretty much taking care of that." (*Id.* at p. 31). Finally, Dr. Ashurst recommended that plaintiff avoid "extreme heat and moisture," (*id.* at pp. 36, 37), because "*if* [plaintiff] is given to not being able to withstand *extreme* heat and moisture, *he might not be able to walk as far* as he normally could." (*Id.* at p. 37) (emphasis added). Thus, it appears from this testimony that the only limitations Dr. Ashurst placed on plaintiff with respect to his occasional neuropathy was the use of soft mat and jogging shoes and avoidance of extreme heat and moisture.[11]

For his part, plaintiff testified that he cannot walk more than one mile and that he cannot run at all. Although plaintiff indicated that he occasionally has difficulty walking due to neuropathy (and for this reason occasionally obtained a ride to the defendant's medical facility when he was feeling poorly to check his blood sugar), the evidence indicates that this difficulty was intermittent and mild during his employment with defendant. There was no evidence (from plaintiff's physician or otherwise) as to the expected long term effects, if any, of diabetes on plaintiff's ability to walk. Moreover, there was no evidence that plaintiff's walking difficulties interfered with plaintiff's ability to perform his job while in defendant's employ or that it interfered with his ability to care for himself. In fact, plaintiff testified that, other than having to take frequent breaks and eat every two hours, his diabetes did not interfere with his job performance. (Williamson depo. at p. 104).

Plaintiff's impairment is less than that of other individuals who were determined not to be disabled in the major life activity of walking. *See, e.g., Taylor v. Pathmark Stores, Inc.,* 177 F.3d 180, 185–187 (3rd Cir.1999) (plaintiff with a permanent ankle impairment of 16% who required a ten-minute sitting break for every fifty minutes he stood or walked was not substantially limited in the major life activity of walking or standing and was thus not disabled under ADA); *Talk v. Delta Airlines, Inc.,* 165 F.3d 1021, 1024–25 (5th Cir.1999) (plaintiff whose right leg was shorter than her left leg, whose right foot was in a permanently flexed position, and who must wear a built-up shoe was not substantially limited in the major life activity of walking and was thus not disabled under ADA); *Penny v. United Parcel Service,* 128 F.3d 408, 415 (6th Cir.1997) (plaintiff who injured his back and shoulder in three separate incidents over a three-year period was not substantially limited in the major life

---

**10.** Plaintiff presented evidence that his control of his diabetes varies, with the lowest level of control (occurring in 1996) being rated by Dr. Ashurst as "fair." (Ashurst depo. at pp. 18–20). Although these control levels inform the treating physician of the sugar level "for 6 to 8 weeks before" the test, the control levels are typically measured only once a year. (*Id.* at p. 20).

**11.** Plaintiff testified that extreme heat and moisture caused him, as a diabetic, to sweat profusely, which resulted in an excessive loss of potassium. The potassium loss, in turn, "makes you kind a blurry visioned," causes leg cramps, and could make the person "a little bit delirious." (Williamson depo. at p. 16).

activity of walking and was thus not disabled under ADA in light of his testimony that "he was able to go fishing and hunt rabbits, squirrels, pheasant, and deer" as well as "fulfill his job duties in a relatively satisfactory manner (which required a substantial amount of walking) during the period when his ability to walk allegedly was substantially impaired."); *United States Equal Employment Opportunity Commission v. Sears, Roebuck and Company,* 1999 WL 977072 *4 (N.D.Ill. October 22, 1999) (diabetic plaintiff who suffered from neuropathy was not substantially limited in the major life activity of walking and was thus not disabled under ADA in light of evidence that she could stand and walk around the sales floor for 5 to 6 hours at a time without the use of her cane and "was still able to go shopping at the end of her shift with the use of her cane.").[12]

This court agrees with the observation of the Court of Appeals for the Third Circuit in *Kelly v. Drexel University:*

> It is difficult, indeed perhaps not possible, to draw a bright line delineating the point at which a condition affecting an employee's ability to walk can be regarded as a disability within the ADA. Yet we agree with the general thrust of [the therein-discussed] district court cases. While we are not unfeeling with respect [plaintiff's] condition, still we simply cannot regard it as a disability under the ADA as it does not substantially limit him in the relevant major life activity, walking.

*Kelly,* 94 F.3d 102, 108 (3rd Cir.1996). In *Kelly,* the plaintiff suffered from "severe post-traumatic degenerative joint disease of the right hip and protrusio acetabulum of the right hip joint" and consequently walked with a "noticeable" limp. *Id.* at pp. 103–104. Noting that Kelly admitted that he is able to walk, the court framed the question as "whether he adduced sufficient evidence from which a factfinder reason-

ably could conclude that the nature and severity of his injury significantly restricted his ability to walk as compared with an average person in the general population." *Id.* at p. 105. In addition to his treating physician's statement that Kelly's "condition causes him great difficulty in walking around," Kelly produced evidence that "he could not walk 'more than a mile or so' and that he 'certainly couldn't jog.' ... [and] that when climbing stairs, 'I have to pace myself slower, and I would, naturally, hold onto the rail.' " *Id.* at p. 106. After examining the EEOC regulations and manual, the Third Circuit noted that it is "clear that comparatively moderate restrictions on the ability to walk are not disabilities." *Id.* After reviewing a number of district court cases involving the ADA and the major life activity of walking, the court of appeals concluded that Kelly's walking impairment did not constitute a disability in the major life activity of walking and therefore held that Kelly was not disabled under the ADA. *Id.*

Here, examination of the evidence presented as to the extent of plaintiff's impairment and a review of numerous cases addressing the major life activity of walking, the court concludes that there is insufficient evidence upon which a reasonable juror could find that plaintiff was substantially limited in the major life activity of walking and thus disabled under the ADA.

### b. Working

The court next considers whether plaintiff's physical impairments substantially limit his ability to work. *See* 29 C.F.R. pt. 1630, App. § 1630.2(j) (1998) ("If an individual is not substantially limited with respect to any other major life activity, the individual's ability to perform the major life activity of working should be considered.").

**12.** *But see, Belk v. Southwestern Bell Telephone Co.,* 194 F.3d 946 (8th Cir.1999) (plaintiff whose bout with polio left him with a "pronounced limp" and "forc[ed] him to wear a full-length leg brace at all times" was substantially limited in the major life activity of walking and was thus disabled under ADA in spite of evidence that he "coaches Little League, hunts, fishes, and had built a garage and an addition to his home.").

In order for a physical impairment to substantially limit the major life activity of working, the impairment must significantly restrict a person's "ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities." 29 C.F.R. § 1630.2(j)(3)(i). For example, a person who develops a back condition that prevents him from performing any heavy labor would be substantially limited in his ability to work because he is precluded from performing a class of jobs. *See* 29 C.F.R. Pt. 1630, App. § 1630.2(j) (1998). On the other hand, the "inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working." 29 C.F.R. § 1630.2(j)(3)(i). Thus, a major league pitcher who develops a strained elbow and can no longer throw a baseball would not be considered substantially limited in his ability to work because he is only precluded from performing a specialized job or a narrow range of jobs. *See* 29 C.F.R. Pt. 1630, App. § 1630.2(j) (1998). "To be substantially limited in the major life activity of working, then, one must be precluded from more than one type of job, a specialized job, or a particular job of choice." *Sutton,* 119 S.Ct. at 2151.

The EEOC regulations set forth three factors that courts may consider when evaluating whether an individual is substantially limited in the major life activity of working: (1) the individual's geographical area; (2) the job from which the person was disqualified because of an impairment, and the type and number of jobs within the same geographical area utilizing similar training, knowledge, skills or abilities from which the person is also disqualified because of the impairment; and (3) the job from which the person was disqualified because of an impairment, and the type and number of jobs within the same geographical area that do not utilize similar training, knowledge, skills or abilities from which the person is also disqualified because of the impairment. *See* 29 C.F.R. § 1630.2(j)(3)(ii); *see also Gordon,* 100

F.3d at 911–12. In addition, the determination of whether a plaintiff was substantially limited in his ability to work must be made as of the time the alleged discriminatory conduct occurred. *See Pritchard v. Southern Co. Services,* 92 F.3d 1130, 1133–34 (11th Cir.), *amended on reh'g,* 102 F.3d 1118 (11th Cir.1996).

Upon considering these factors and the evidence in the record, the court concludes that plaintiff has not demonstrated that his physical impairments substantially affected his ability to perform his long-standing job duties, much less his ability to perform a broad class of jobs. Plaintiff has not alleged, nor is there any evidence to suggest, that he was unable to perform his job duties. More importantly, plaintiff has not presented any evidence indicating that he cannot perform a broad range or class of jobs. *See Swain,* 146 F.3d at 858 ("Although a plaintiff seeking recovery under the ADA is not required to provide a comprehensive list of jobs which she cannot perform, the person must provide some evidence beyond the mere existence and impact of a physical impairment to survive summary judgment."). Although plaintiff has asserted that his fluctuating blood sugar level would occasionally force him to take a break from his work and that he was required to test his blood sugar at the mill's medical department (located some distance away from plaintiff's work station), plaintiff does not allege that such breaks were of such duration or frequency that they interfered with his job duties. Indeed, neither plaintiff nor defendant have even suggested that plaintiff was unable to perform any aspect of his job for any reason, much less because of his diabetes or neuropathy. The court therefore concludes that plaintiff's diabetes and neuropathy did not substantially limit him in the major life activity of working at the time the alleged disability harassment occurred.

Accordingly, because plaintiff has not shown that his physical impairments substantially limit any of his major life activi-

ties, the court holds that he is not actually disabled within the meaning of the ADA.[13]

### C. Whether Plaintiff is Perceived to be Disabled by Defendant

■ Plaintiff has offered evidence that defendant generally perceived all diabetics as "handicapped." In a training manual entitled "Fair Employment Practices" used by defendant, diabetes is specifically identified as a "hidden handicap":

**Hidden Handicaps**

Although the term "handicap" is most commonly applied to obvious or visible disabilities, such as blindness or paralysis, the law also require accommodation to the limitations of less visible disabilities, known as "hidden handicaps." Some common hidden handicaps are listed below:

\* epilepsy, *diabetes,* heart disease

\* cancer, kidney failures

\* a history of mental illness, alcoholism, or drug abuse

Williamson's Resp. to M.S.J., Exh. 1 (italics added).

Although the court has doubts whether this evidence establishes that defendant perceived plaintiff to be "disabled" as that term is used in the ADA, the court concludes that summary judgment is inappropriate at this time on the record before it on the issue of whether defendant perceived plaintiff to be disabled.

### D. Retaliation

During the pretrial conference, the court inquired whether plaintiff was asserting a retaliation claim due to his work station being moved from the machine shop to the fabrication shop. After some hesitation, plaintiff answered in the affirmative. Defendant protested, claiming that retaliation was not included in the EEOC charge or the pleadings. The court ordered the parties to brief the issue.[14] Having examined the ensuing submissions and the court record, the court concludes that it lacks subject matter over a retaliation claim because plaintiff did not include it in his EEOC charge, and therefore, did not exhaust his administrative remedies as to a retaliation claim. Alternatively, the court concludes that plaintiff did not include a retaliation claim in his complaint or in the pretrial document.

### A. Exhaustion of Remedies

■ The court concludes that it lacks subject matter jurisdiction over the retaliation claim because plaintiff did not exhaust his administrative remedies due to his failure to include it in his EEOC charge. As binding precedent makes clear:

The starting point for determining the permissible scope of a judicial complaint is the administrative charge and investigation. The judicial complaint is limited to the scope of the administrative investigation which could reasonably be expected to grow out of the charge of discrimination. *Evans v. U.S. Pipe & Foundry Co.,* 696 F.2d 925, 929 (11th Cir.1983); *Eastland v. Tennessee Valley Authority,* 714 F.2d 1066, 1067 (11th Cir.1983), *cert. denied sub nom. James v. Tennessee Valley Authority,* 465 U.S. 1066, 104 S.Ct. 1415, 79 L.Ed.2d 741 (1984).

---

13. In reaching this conclusion, the court notes that it does not doubt that plaintiff suffers from neuropathy (periodically, at least) and that such neuropathy and his diabetes as a whole constitutes impairments. Rather, the court's ruling is predicated on a lack of evidence that this impairment *substantially limits* plaintiff's major life activities of walking and working. For that reason, plaintiff is considered to be not disabled as that term is used in the ADA.

14. At the time it raised the issue during the pretrial conference, the court was unaware that the parties had discussed during plaintiff's deposition the very question of whether a retaliation claim was being asserted in this case. (Williamson depo., at pp. 153–155). Although the parties do not appear to have resolved the issue, neither party moved for a clarification/amendment, choosing to let the issue ride with the case until the court raised it in an attempt to clarify the triable issues drafted by the parties.

*Griffin v. Carlin,* 755 F.2d 1516, 1522 (11th Cir.1985). This "grows out of" test is sometimes referred to as the "like and related" rule:

> In *Sanchez v. Standard Brands, Inc.,* 431 F.2d 455 (5th Cir.1970), this court set forth what has been termed the "like or related" rule or "reasonable expectation" test which defines the scope or degree to which the discrimination alleged in a Title VII plaintiff's complaint can vary from that charged in the EEOC complaint and that investigated by the [Equal Employment Opportunity] Commission. In *Sanchez,* we held "that the allegations in a judicial complaint filed pursuant to Title VII 'may encompass any kind of discrimination like or related to the allegations contained in the charge and growing out of such allegation during the pendency of the case before the Commission.'" *Id.* at 466, *quoting King v. Georgia Power Co.,* 295 F.Supp. 943, 947 (N.D.Ga.1968). The court further stated that "the 'scope' of the judicial complaint is limited to the 'scope' of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination." *Id.*

*Evans v. U.S. Pipe & Foundry Co.,* 696 F.2d 925, 928 (11th Cir.1983).

The reason underlying the exhaustion requirement is "that the Commission should have the first opportunity to investigate the alleged discriminatory practices to permit it to perform its role in obtaining voluntary compliance and promoting conciliations efforts." *Evans,* 696 F.2d at 929. *Accord, Sanchez,* 431 F.2d at 466 ("[T]he purpose of a charge of discrimination is to trigger the investigatory and conciliatory procedures of the EEOC. Once a charge has been filed, the Commission carries out its investigatory function and attempts to obtain voluntary compliance with the law. Only if the EEOC fails to achieve voluntary compliance will the matter ever become the subject of court action.").

After review of plaintiff's EEOC charge, the employer/defendant's response, and the EEOC's investigation results letter, the court concludes that retaliation was not encompassed by the charge or the EEOC's ensuing investigation. This conclusion is based on a number of factors. First, although the alleged retaliation occurred before plaintiff filed his EEOC charge, he did not check the "retaliation" box on the EEOC charge, did not state in his charge that he had engaged in any statutorily-protected activity, did not state that the "segregation" constituted retaliation, and did not mention "retaliation" in any form.[15] Second, the EEOC investigation results letter does not mention any statutorily-protected activity in which plaintiff allegedly participated nor does it mention any form of retaliation.[16] This is the strongest indication that retaliation

---

**15.** The court is not unmindful of the *Sanchez* court's holding that "the failure to place a check mark in the correct box is [not] a fatal error. In the context of Title VII, no one—not even the unschooled—should be boxed out." *Sanchez,* 431 F.2d at 463. And the court is aware of the *Sanchez* court's strong leaning toward a liberal interpretation of the factual allegations made in the EEOC charge. However, the *Sanchez* court was concerned about a layman completing the EEOC charge form, and it indicated that its ruling would have been different if the form had been completed by an attorney: While the distinction between the two types of discrimination [sex and national origin] will undoubtedly be crystal clear to a lawyer delving into the law books to research a legal question, it may not be so apparent to an uneducated layman who is required to put pen to paper and, by filling out a form, to articulate his grievance "'as best he can without expert legal advice.'" *Sanchez,* 431 F.2d at 463 n. 4 (*quoting Pettway v. American Cast Iron Pipe Co.,* 411 F.2d 998, 1005 (5th Cir.1969)).

**16.** Although plaintiff's EEOC charge does mention that he was "segregated" from his co-workers, from the face of the charge it appears that the alleged "segregation" was a form of disability harassment, not an act of retaliation because plaintiff had engaged in a statutorily-protected activity. Additionally, the EEOC's investigation results letter indicates that it investigated the "segregation" move, and it appears that its investigation was limited to the issue of whether the move was an incident of harassment, not the additional issue of whether the move was an incident of retaliation.

was not investigated by the EEOC. Third, plaintiff never amended or supplemented his EEOC charge to add a retaliation claim. Fourth, plaintiff was represented by counsel at all relevant times, and it readily appears that his EEOC charge was drafted by learned counsel, not a layman unschooled in the niceties of the law.[17]

This conclusion is in accordance with *Clark v. City of Macon,* 860 F.Supp. 1545, 1551 (M.D.Ga.1994) (holding that the court lacked jurisdiction over a retaliation claim that was not included in plaintiff's EEOC charge even though the retaliation allegedly occurred prior to the filing of the EEOC charge). *See also Mulhall v. Advance Security, Inc.,* 19 F.3d 586, 589 n. 8 (11th Cir.1994) (affirming the district court's conclusion that plaintiff's promotion claims "were barred by her failure to file an [EEOC] administrative complaint" because "[a] claim of unequal pay [for which plaintiff had filed an EEOC administrative complaint] is not the equivalent of a claim alleging a failure to promote."); *Murray v. John D. Archbold Memorial Hosp., Inc.,* 50 F.Supp.2d 1368, 1381–82 (M.D.Ga.1999) (holding that plaintiff's EEOC charge of race discrimination with respect to herself did not include plaintiff's disparate impact claims, resulting in the dismissal of the disparate impact claims for a failure to exhaust her EEOC administrative remedies—"[T]he undisputed facts in the record show that the EEOC investigated her charge of race discrimination only with respect to her application for employment, rather than with respect to the potentially disparate impact the weight policy may have upon black applicants.").

In reaching this conclusion, the court finds that *Sanchez, Griffin, Gupta v. East Texas State University,* 654 F.2d 411 (5th Cir.1981), and *Baker v. Buckeye Cellulose Corp.,* 856 F.2d 167 (11th Cir.1988), are distinguishable. In *Sanchez,* the EEOC charge was completed by a layman, not an attorney. Moreover, Sanchez ultimately amended her EEOC charge to assert ex-

pressly both types of alleged discrimination on which she latter based her judicial complaint. Here, plaintiff never amended his charge to include an allegation of retaliation even though he was represented by an attorney who understood the legal distinction between a charge of discrimination and a charge of retaliation. Unlike *Sanchez* where the EEOC did investigate both types of discrimination, the EEOC's investigation in this case did not include consideration of alleged retaliatory conduct by the employer because retaliation was not included in the EEOC charge.[18]

In *Griffin,* the employees' administrative charge contained allegations that the employer "systematically excluded [black employees] in training and development and opportunities for advancement." 755 F.2d at 1519. Reversing the district court's dismissal of the judicial complaint challenging the use of written tests in the promotion process, the court of appeals found that "[t]he written examinations were an integral part of the promotional scheme from 1968 through 1976 because employees became eligible for promotion to supervisory positions only by attaining a passing score on the examination. Thus, the impact of the written test should have been [and, from the administrative investigative report, it appeared that it was] encompassed in a reasonable investigation of this charge of systemic discrimination in promotions." *Griffin,* 755 F.2d at 1522. Here, because retaliation is a separate, independent cause of action from a discrimination cause of action, it cannot be said to be an integral part of the underlying discrimination claim, and, therefore, would not have been encompassed in a reasonable investigation of plaintiff's charge of disability harassment.

*Gupta* and *Buckeye Cellulose* are also distinguishable. In *Gupta,* the plaintiff allegedly suffered retaliation *after he filed his EEOC charge.* In *Buckeye Cellulose,* the plaintiff allegedly suffered retaliation *after she filed her judicial complaint.* In

---

**17.** *See* footnote 15.

**18.** *See* footnote 16.

*Gupta*, the court of appeals held "that it is unnecessary for a plaintiff to exhaust administrative remedies prior to urging a retaliation claim *growing out of an earlier charge.*" *Gupta*, 654 F.2d at 414 (emphasis added). One of the two bases of the *Gupta* holding is that

> It is the nature of retaliation claims that they arise after the filing of the EEOC charge. Requiring prior resort to the EEOC would mean that two charges would have to be filed in a retaliation case [—] a double filing that would serve no purpose except to create additional procedural technicalities when a single filing would comply with the intent of Title VII.

*Id.* The *Buckeye Cellulose* court, faced with a similar circumstance, followed the *Gupta* precedent and held that the court had jurisdiction over a retaliation charge which occurred after the complaint was filed, even though the plaintiff had not filed a retaliation charge with the EEOC. The situations facing the *Gupta* and *Buckeye Cellulose* courts are not similar to the situation before this court. Here, the alleged retaliation occurred before plaintiff filed his EEOC charge—hence, there was no possibility of a useless "double filing"— the concern of the *Gupta* and *Buckeye Cellulose* courts.[19]

#### B. Failure to Plead

■ Alternatively, the court concludes that plaintiff failed to include a retaliation claim in his judicial complaint and in the pretrial document. Clearly, the thrust of plaintiff's case is alleged hostile work environment harassment due to his actual or perceived disability based on his diabetes. In order to state a claim for retaliation, plaintiff would have had to allege that defendant moved plaintiff's work station because he complained about the alleged disability harassment or engaged in some other statutorily-protected activity. *Holifield v. Reno*, 115 F.3d 1555, 1566 (11th Cir.1997) ("To establish a *prima facie* case

of retaliation, the plaintiff must show: (1) that he engaged in statutorily protected expression; (2) that he suffered an adverse employment action; and (3) that there is some causal relationship between the two events.") (citations omitted).

Upon examination of the parties' pretrial document, it is readily apparent that plaintiff does not assert an additional claim of retaliation. For example, with respect to his move from the machine shop to the fabrication shop, plaintiff states that defendant's proffered reasons for the move were "pretextual," (pretrial doc. pp. 1–2), and he specifically states that one of the issues in the case is whether the proffered reasons were "pretext *for discrimination.*" (Pretrial Doc. p. 9) (emphasis added). Additionally, plaintiff alleges that his supervisor told him that "he was being moved in the fabrication shop *because of his disability,* (pretrial doc. p. 2) (emphasis added)," and he lists, as one of his three legal issues in the case, "whether or not the Plaintiff was segregated from co-workers and other employees *because of his disability.*" (Id. at p. 10) (emphasis added). Also in the pretrial document, plaintiff lists two causes of action: "Disability Harassment" and "Segregation." (Pretrial Doc. pp. 11–12). As required by this court's preliminary pretrial order, plaintiff set forth his "Theory of Cause of Action" with respect to each cause of action. For his "segregation" claim, plaintiff asserts

> Thus, with regard to the Plaintiff, the third element of his *prima facie* case would be that *he was unlawfully subjected to discrimination because of his disability* by his segregation from his co-workers when he alone was placed in the fabrication shop while the co-workers remained in the machine shop.

Pretrial Doc. p. 12 (second emphasis added). All three of these examples clearly show that plaintiff is claiming that the move was a form of disability harassment due to his actual or perceived disability

---

**19.** The court is troubled by defendant's failure to cite any of these binding Fifth and Eleventh Circuit precedents in its brief, choosing instead to rely upon out-of-circuit appellate cases applying a different standard.

and that plaintiff is not claiming that the move constituted retaliation for having engaged in some form of statutorily-protected activity.

The only instance in which plaintiff suggests that the move constituted retaliation for his complaints of disability harassment is in the "Facts Supporting [Segregation] Cause of Action" section where he states:

> *In response to the Plaintiff* testing his blood and then *complaining about the subsequent harassment, the Defendant segregated the Plaintiff,* whose traditional workplace was the machine shop with the rest of his crew, to the fabrication shop where he worked alone and with only sparse and infrequent contact with any other employee. When asked why he was being moved, the Defendant, through the Plaintiff's supervisor, told the Plaintiff *it was because of his disability.*

Pretrial Doc. p. 12) (emphasis added). After long consideration, the court concludes that this statement is insufficient to state a claim of retaliation. First, this one statement is contradicted by multiple other statements in the same document (indeed, in the same paragraph) in which plaintiff plainly states that defendant moved/segregated him because of his disability, not because he complained of the disability harassment. Second, the term "retaliation" has a specific legal meaning, and it is a separate cause of action unto itself. Although the court is reluctant to read a pleading too narrowly, the court is of the opinion that plaintiff's failure to use the term "retaliation" or to plead that he was subjected to an adverse employment action because he engaged in a statutorily-protected activity constitutes a fatal pleading defect. Simply stated, neither the complaint nor the pretrial document put the defendant on notice that it was defending a retaliation claim. Plaintiff is represented by counsel, and pleadings which are drafted and signed by a lawyer should not leave

the court and opposing parties guessing about their construction, especially as to a matter as basic as what a party's claims are. Accordingly, the court concludes that plaintiff did not plead a retaliation cause of action.

## CONCLUSION

Defendant is entitled to judgment as a matter of law as to plaintiff's claims regarding hostile work environment disability harassment based on an actual disability and retaliation. Defendant is not entitled such judgment as a matter of law as to plaintiff's claim regarding hostile work environment disability harassment based on a perceived disability. The court notes that this judgment adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties. Accordingly, under Federal Rule of Civil Procedure 54(b), the court finds that entry of a final judgment at this time is inappropriate. For this reason, judgment will be entered by separate document as required by Rule 58 at the conclusion/resolution of all claims as to all parties.

DONE this the 1st day of October, 1999.[20]

---

**20.** Although this written order was signed on January 27, 2000, it is being entered *nunc pro*

*tunc* as of the date of the court's oral ruling.